# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

WILLIAM R. COPELAND,

      Petitioner,

v.                                 Case No. 3:17-cv-735-J-32MCR

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## <u>ORDER</u>

## I.   <u>Status</u>

Petitioner, an inmate of the Florida penal system, initiated this case by filing a pro se Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254. Doc. 1. He is proceeding on an Amended Petition challenging a state court (Flagler County, Florida) judgment of conviction for attempted first degree murder, aggravated battery with a firearm, and shooting into a building. Doc. 10. He is currently serving a forty-year term of incarceration to be followed by a life term of probation. <u>Id.</u> Respondents have responded. <u>See</u> Doc. 18; Response.[1]

---

[1] Respondents also filed numerous exhibits in support of their Response. <u>See</u> Doc. 19. The Court cites to the exhibits as "Resp. Ex."

Petitioner declined to file a reply and instead filed a Notice that he intends to rely on the claims as alleged in his Amended Petition. See Doc. 21. This case is ripe for review.

## II.   Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then

> presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has

> repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

4

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state

procedural rule. See, e.g., Coleman,[2] supra, at 747–
748, 111 S. Ct. 2546; Sykes,[3] supra, at 84–85, 97 S. Ct.
2497. A state court's invocation of a procedural rule to
deny a prisoner's claims precludes federal review of the
claims if, among other requisites, the state procedural
rule is a nonfederal ground adequate to support the
judgment and the rule is firmly established and
consistently followed. See, e.g., Walker v. Martin, 562
U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62
(2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612,
617–618, 175 L.Ed.2d 417 (2009). The doctrine barring
procedurally defaulted claims from being heard is not
without exceptions. A prisoner may obtain federal
review of a defaulted claim by showing cause for the
default and prejudice from a violation of federal law.
See Coleman, 501 U.S., at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be
excused under certain circumstances. Notwithstanding that a claim has been
procedurally defaulted, a federal court may still consider the claim if a state
habeas petitioner can show either (1) cause for and actual prejudice from the
default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d
1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause and
prejudice,

the procedural default "must result from some objective
factor external to the defense that prevented [him] from
raising the claim and which cannot be fairly
attributable to his own conduct." McCoy v. Newsome,
953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Carrier,

_____

[2] Coleman v. Thompson, 501 U.S. 722 (1991).

[3] Wainwright v. Sykes, 433 U.S. 72 (1977).

> 477 U.S. at 488, 106 S. Ct. 2639).[4] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir.

---

[4] Murray v. Carrier, 477 U.S. 478 (1986).

2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

### III.   **Petitioner's Claims and Analysis**

#### A. Ground One

Petitioner argues that his trial attorney was ineffective for failing to file a motion to suppress evidence of the firearm. Doc. 10 at 5. According to Petitioner, Detective Steve Brandt, upon finding the firearm, took the evidence out of a brown bag and placed it in a black bag. <u>Id.</u> Petitioner contends that Detective Brandt then took a photo of the firearm in the black bag, "in an attempt to make it appear as [if] the firearm was found in the black bag." <u>Id.</u> Because Detective Brandt tampered with such evidence, Petitioner alleges counsel should have sought suppression.

Petitioner raised this claim in his second Florida Rule of Criminal Procedure 3.850 motion for postconviction relief. Resp. Ex. T at 9-11. The trial court dismissed the claim with prejudice, finding in pertinent part as follows:

> Defendant filed this Second or Successive Motion for Postconviction Relief on January 24, 2017. He alleges Detective Brandt said that the firearm would be

found in a brown bag, like the witness Wiggins said, but the gun was actually found in Defendant's black Gerber bag. Therefore, Defendant surmises that law enforcement must have moved the gun to his bag in order to establish probable cause for his arrest. He claims that his counsel was ineffective for failing to file a motion to suppress the firearm and for failing to preserve the issue of evidence tampering for appeal. He claims that he could not have filed this issue in his first motion for postconviction relief because he did not have the documents and discovery from counsel.

A defendant is entitled to file one motion for postconviction relief, and claims raised in a successive motion may be denied if they could have been raised in the prior postconviction motion. Owen v. Crosby, 854 So. 2d 182 (Fla. 2003). Florida Rule of Criminal Procedure 3.850(h)(2) states:

> A second or successive motion is an extraordinary pleading. Accordingly, a court may dismiss a second or successive motion if the court finds that it fails to allege new or different grounds or, if new and different grounds are alleged, the judge finds that the failure of the defendant or the attorney to assert those grounds in a prior motion constituted an abuse of the procedure or there was no good cause for the failure of the defendant or defendant's counsel to have asserted those grounds in a prior motion.

The Court finds that the grounds in the successive motion are different from the grounds raised in Defendant's prior motion; however, the Court finds no good cause for Defendant's failure to assert them in his first motion. Defendant makes no allegation that this evidence is newly discovered, and any such allegation would fail as a matter of law. Defendant was present during trial when the witnesses testified as to

the color of the bag where the firearm was found. If Defendant wished to review the trial transcripts prior to filing his initial motion, then he should have requested those documents prior to filing. Defendant's Exhibit A to the second, successive motion demonstrates that Defendant did not request documents from his attorney until May 3, 2016, after the ruling on his first motion. Therefore, Defendant's motion shall be dismissed with prejudice, as it is procedurally barred because Defendant shows no good cause for failing to assert these grounds in his prior motion.

Further, Defendant's motion fails substantively as well. As explained in the Interim Order and Final Order to Defendant's first motion for postconviction relief, the FCSO[5] had ample probable cause to arrest Defendant. Ex. A, B. The FCSO had no need to fabricate probable cause for Defendant's arrest, and contrary to Defendant's assertion in his motion, there was direct evidence presented against him at trial, which the jury weighed and found him guilty. In addition, Defendant has no evidence or affidavits to support his bare allegation that the FCSO tampered with evidence, other than the trial testimony regarding the color of the bag in which the firearm was found. The Court finds neither deficient performance nor prejudice, under the <u>Strickland</u> standard, for counsel's alleged failure to file a motion to suppress. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). Likewise, the Court finds no ineffective assistance of counsel for counsel's alleged failure to preserve the issue of evidence tampering for appeal.

Resp. Ex. T at 24-27. The Fifth District Court of Appeal per curiam affirmed the

trial court's summary denial without a written opinion. Resp. Ex. X.

---

[5] Flagler County Sherriff's Office.

Respondents argue Petitioner is barred from raising this claim on federal habeas review because the state court declined to consider it due to an independent and adequate state procedural bar. Resp. at 9. The Court agrees.

The state court's finding that the Rule 3.850 motion raising this claim was successive rests on independent and adequate state grounds that preclude federal habeas review. See, e.g., Jennings v. McDonough, 490 F.3d 1230, 1247-48 (11th Cir. 2007) (holding that a state court's conclusion that the petitioner's claims were procedurally barred by Florida's rule against successive postconviction motions was a state law ground independent of the federal question and adequate to support the state court's judgment, thereby rendering the claims procedurally defaulted on federal habeas review). Although the trial court alternatively found no merit to the claim, this Court must honor the state court's reliance on a state-law ground for rejecting this claim because the state court explicitly invoked a state procedural rule as a separate and independent basis for its decision. Harris v. Reed, 489 U.S. 255, 264 n.10 (1989). Of note, "where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994) (citations omitted); see also Marek v. Singletary, 62 F.3d 1295, 1301 (11th Cir. 1995) (finding that when a state court addresses both the independent state

procedural ground and the merits, the federal court should apply the bar and decline to reach the merits). As such, this claim is procedurally defaulted, and Petitioner fails to allege or show cause for and prejudice from this procedural default. He also fails to meet the fundamental miscarriage of justice exception. Ground One is due to be denied.

**B. Ground Two**

Petitioner argues the following: "[s]tate obtained conviction by coercing the witness by the state's own admissions on March 28, 2016 at a[n] evidentiary hearing[.] The state clarifying stat[ed]: [I] don't want the court to think that the state was arguing that they actually witnessed Defendant firing the shots because that was not the case. [I]f that was not the case and the victim and state have two different statements which does not coincide with each other." Doc. 10 at 6.

Respondents argue that Petitioner failed to raise this claim in state court, and thus, it is unexhausted and procedurally defaulted. Resp. at 10. In his Amended Petition, Petitioner provides that he raised this issue on direct appeal, see Doc. 10 at 6; however, a review of Petitioner's initial brief on appeal shows no claim regarding the state's alleged coercion of an unknown witness, Resp. Ex. I. Petitioner also contends he raised this issue in a Rule 3.850 motion, which the trial court allegedly denied on June 2, 2017. See Doc. 10 at 7. However, while the record before this Court shows that the trial court entered an order

12

on June 2, 2017, denying a "second successive" Rule 3.850 motion, Resp. Ex. Z at 29-32; that June 2, 2017, order and the Rule 3.850 motion that the trial court denied on that date do not contain the claim currently before the Court in Ground Two, see id. at 11-32.

Instead, a review of Petitioner's state court docket shows that he first raised this claim in state court through a successive Rule 3.850 motion filed on June 25, 2017.[6] State v. Copeland, No. 2011-CF-000533 (Fla. 7th Cir. Ct.). On July 12, 2017, the trial court dismissed the June 25, 2017, motion as legally insufficient because Petitioner failed to satisfy the oath requirement of Rule 3.850(c) but granted Petitioner sixty days to file an amended motion. Id. Petitioner filed his amended motion raising this claim on July 19, 2017, but thereafter, filed a motion to voluntarily dismiss his July 19, 2017, motion. Id. The trial court granted Petitioner's motion to dismiss on March 26, 2018. Id. As such, it appears that this claim is unexhausted and procedurally barred. Further, Petitioner fails to argue or show cause for or prejudice from this procedural bar; and he does not allege he is entitled to the fundamental miscarriage of justice exception.

In any event, while the nature of Petitioner's claim is unclear, he appears to be challenging the state's statement made during the trial court's evidentiary

---

[6] See Houston v. Lack, 487 U.S. 266, 276 (1988) (mailbox rule).

hearing on ground one of his initial Rule 3.850 motion.[7] Resp. Ex. O. The trial court held a bifurcated evidentiary hearing on the claim on March 9, 2016, and March 28, 2016. Resp. Ex. N at 124-44. During the March 28, 2016, hearing, the state made the following statement:

> Now, as you know, the issue here is whether or not there was probable cause on that particular night to detain Mr. Copeland. The State does not make any argument saying that he was not detained, and that there needed to be probable cause up until that point. So we concede that point. But the State also argues that there was sufficient probable cause to detain him at the time that he made his statement to law enforcement.
>
> And the thing I wanted to clarify for the Court was, I didn't want the Court to think the State was arguing that, that the victims in the case or the witnesses, Corina Venezia, I think the two 9-1-1 calls that were entered into evidence, one which was made by Corina Venezia, the other by her mother Josephine Venezia saying that they knew that it was Mr. Copeland.
>
> **I don't want the Court to think that the State was arguing that they actually witnessed Mr. Copeland firing the shots because that was not the case.** However, they knew that it was Mr. Copeland that had fired the shots because earlier that day there had been a conversation where Corina Venezia, who was the ex-girlfriend of Mr. Copeland, they had a child, a daughter together, Corina Venezia had asked – there was a discussion about child support, and that discussion turned into an argument during

---

[7] In ground one of his initial Rule 3.850 motion, Petitioner argued that trial counsel was ineffective for failing to "petition the trial court for said de facto arrest without probable cause" in violation of his Fourth Amendment rights. Resp. Ex. N at 8.

> which Mr. Copeland threatened Corina Venezia and
> her family.

Resp. Ex. O at 14 (emphasis added). Reading this challenged statement in context, Petitioner appears to claim this statement conflicts with the testimony at trial because Corina Venezia and Josephine Venezia testified they saw Petitioner fire the shots. However, Petitioner is mistaken. It was the victim, Accursio Venezia, who testified that after being hit by the second shot, he was "looking straight, ahead, and [saw] William Copeland shooting at [him]." Resp. Ex. C at 115. Corina Venezia testified she did not see who fired the shots, <u>see id.</u> at 87, and Josephine Venezia did not testify at trial. As such, the state did not present conflicting testimony from Corina or Josephine Venezia, and this claim is due to be denied.

## C. Ground Three

Petitioner raises a claim of newly discovered evidence in the form of sworn statements from two fellow Century Correctional Institution inmates – Kenneth Huffman Jr. and Tarvarus Lee Cooper – in which they attest that someone named "Pooty" committed the crime for which Petitioner was convicted. Doc. 10 at 8. The Court addresses each affidavit in turn.

### i. Cooper Affidavit

Petitioner raised his newly discovered evidence claim regarding Cooper's affidavit in a successive Rule 3.850 motion filed on or about May 15, 2017. Resp. Ex. Z at 11-19. The trial court summarily denied the claim as follows:

> Defendant filed the instant motion, his third "bite at the apple." This second successive motion is untimely because it was not filed within the two-year limitations period provided by Rule 3.850(b); however, Defendant seeks an exception to that rule alleging newly discovered evidence under Rule 3.850(b)(1). He requests that his sentence be set aside and his conviction vacated based upon this newly discovered evidence.
>
> Defendant attaches an affidavit by Tarvarus Lee Cooper, D.C. #R50868, a fellow inmate, who swears that someone named "Pooty" committed the crime for which Defendant is now incarcerated. The affidavit indicates that, on an unidentified date, Mr. Cooper drove Pooty to an unidentified house in Palm Coast; Mr. Cooper waited while Pooty went to the front door with a brown bag; Pooty walked to the back of the house and Mr. Cooper heard gun shots, then Pooty ran back to the car and asked Mr. Cooper to drive him back to his house. Mr. Cooper's affidavit also attempts to establish an alibi for Defendant by stating that Defendant did not go out with him that night because "[Defendant] said it was late and that he had work [indiscernible] the morning."
>
> A defendant must prove two factors to succeed on a motion for postconviction relief on the grounds of newly discovered evidence: (l) the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence;" and (2) the newly discovered

evidence "must be of such nature that it would probably produce an acquittal on retrial." Jones v. State, 591 So. 2d 911, 915-16 (Fla. 1991) (emphasis in original). "The defense known in law as an 'alibi' is that, at the time of the commission of the crime charged in the [information or] indictment, the defendant was at a different place, so that he could not have committed it." Blackwell v. State, 79 Fla. 709, 86 So. 224, 227 (Fla. 1920).

The Court finds that Mr. Cooper's affidavit is inherently incredible and obviously immaterial to the verdict and sentence. Davis v. State, 26 So. 3d 519 (Fla. 2009). As written - without any identification of Pooty, the date that this allegedly occurred, the address of the home, or any reason why Pooty would shoot into a house - the affidavit is not of a nature that would produce an acquittal on retrial. To the extent that the affidavit attempts to establish an alibi for Defendant, it is refuted by the record by Defendant's own testimony that he was near the victim's residence at the time of the shooting. See, e.g., Exhibit A at 4-6.[8]

The Court finds that Mr. Cooper's flimsy affidavit does not contradict the overwhelming evidence that was presented against Defendant over the three-day trial. Defendant admitted that he had motive, and he made threats against the victim's daughter the day of the shooting (an admission corroborated by other evidence). Ex. A at 5-6. Defendant admitted (and his admission was corroborated) that he had a bag that night, and he handed that bag to Anthony Wiggins. Ex. A at 6. Testimony at the trial established that law enforcement found - inside that bag - the firearm that had been used in the shooting. Exhibit B, Trial Transcript at 358, 371. Defendant's claim of newly discovered evidence fails.

---

[8] The trial court is referring to the statements Petitioner made during the trial court's evidentiary hearing on his initial Rule 3.850 motion.

> Upon review of the instant motion in conjunction with the record, the Court finds the motion to be frivolous.

Resp. Ex. Z at 29-32. Petitioner appealed the trial court's denial, Resp. Ex. AA, and the Fifth DCA per curiam affirmed the trial court's denial without a written opinion, Resp. Ex. BB.

Respondents argues that this claim is unexhausted because in appealing the trial court's order, Petitioner only argued the trial court should have granted an evidentiary hearing, and thus, he "waived any error as to the rulings of the trial judge . . . ." Resp. at 11. Respondents are mistaken. When a Rule 3.850 motion is summarily denied without an evidentiary hearing, a prisoner is not required to file an appellate brief when appealing the order; and if he chooses to do so and raises only some issues in the brief, he does not waive review of the remaining issues. <u>See</u> Fla. R. App. P. 9.141(b)(2)(C); <u>see also</u> <u>Cortes v. Gladish</u>, 2016 F. App'x 897, 899 (11th Cir. 2007). As such, this claim is exhausted. To the extent that the Fifth DCA affirmed the trial court's denial on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications.

To provide context, the Court summarizes the evidence presented at trial. Corina Venezia testified that she and Petitioner dated on and off for four years and that they have a daughter together. Resp. Ex. C at 71. In May of 2011, Corina and Petitioner broke up, but he still saw his daughter three to four times

a week. Id. at 72. At that time, Corina and her daughter lived with her parents, Josephine Venezia and the victim Accursio Venezia. Id. at 72. Corina testified that on May 18, 2011, she went to Walmart with a prepaid card that Petitioner had given her to buy formula and diapers for their daughter. Id. at 74. When the prepaid card got declined for insufficient funds, Corina called Petitioner and they got into an argument about money. Id. at 76. She explained that the argument eventually turned threatening, and Petitioner told Corina "I'll kill you" and also threatened to kill her family. Id. at 78. Corina testified she told her father about the threatening statements that Petitioner made, and concerned, Accursio called the police and told law enforcement about the threatening conversation Corina had with Petitioner earlier that day. Id. at 79-80. Corina explained that later that day, she, her mother, her daughter, and her father went to church and returned home around 9:30 p.m. Id. at 81. She testified that around 10:30 p.m., they all went upstairs to their rooms to sleep, and once they were upstairs, the doorbell rang. Id. at 82-83. Corina testified that she immediately knew that it was Petitioner and that she "knew that there was trouble." Id. at 84.

According to Corina, she got up and went to get her father from his room. Id. at 84. They went downstairs and looked out the glass panels next to the front door but did not see anyone. Id. at 85. She explained that while she was still looking through the front windows, her father went to the kitchen area and

about ten seconds later, she heard three gunshots. Id. at 85. Corina said she immediately ran upstairs, and she and her mother called 911. Id. at 86. She stated that her father eventually walked upstairs and sat down, and he was bleeding. Id. Paramedics arrived about ten minutes later and transported her father to the hospital. Id. at 87.

Accursio testified that he recalled calling the police during the day of May 18, 2011, because of a threatening conversation between his daughter and Petitioner. Id. at 110. He further stated that he and his family later went to church and went to bed around 10:30 p.m. that evening. Id. at 111. He testified that around 11:30 p.m. or so, the doorbell rang, so he got up and saw Corina going down the stairs, as well. Id. at 112. He explained he looked out the front windows but saw no one. Id. He then turned around and went to the kitchen in an attempt to get his pellet gun from behind the refrigerator, but before he could get to it, he heard gunshots coming from the sliding glass doors leading to his backyard patio. Id. at 114-15. He explained that he immediately ducked, but the second gunshot hit him. He testified that while this was happening, he was "looking straight ahead, and there's William Copeland shooting at me." Id. at 115. He testified that Petitioner was standing directly in front of the sliding glass doors about 10 to 12 feet away, Petitioner was wearing a black shirt, and holding the gun pushed against the back-sliding window. Id. at 115, 118.

Accursio then ran upstairs to make sure his family was ok, and only then noticed he was bleeding. Id. at 116.

Deputy Steve Carr testified that he examined the crime scene immediately after the shooting and found shell casings by the sliding glass door. Id. at 146. He also found two bullets inside the home, one that had ricocheted off the refrigerator and one that was next to the baseboard by the front door. Id. at 147. Shaun Fuller testified he knows Petitioner as one of his son's friends. Id. at 173. According to Fuller on May 18, 2011, Petitioner arrived at Fuller's house around 9:45 p.m. and asked Fuller to drive him to Walmart to pick up supplies for his daughter. Id. at 179. Fuller explained that Petitioner was holding a small black bag when he arrived at Fuller's home. Id. Fuller agreed to drive Petitioner, so he, Brandi Johnson (Fuller's godson), and Petitioner got into Fuller's 1994 green Jeep Grand Cherokee and began to drive; however, once in the car, Petitioner asked Fuller to take him to his girlfriend's house instead. Id. at 184. When Fuller got to the corner of Lakeview and Laramie Drive, Petitioner asked Fuller to pull over, so Fuller pulled to the right-side of the road. Id. at 185. Petitioner then got out of the vehicle and Fuller leaned his seat back to take a nap. He and Brandi remained inside the vehicle, waiting on Petitioner to return. Id. at 187. Fuller did not recall which direction Petitioner went once he got out of the car. Id. at 188. Fuller said he fell asleep and when Petitioner came back to the car, he appeared out of breath. Id. at 789. According to Fuller,

Petitioner then asked Fuller to drive him to McDonald's. Id. at 191. Fuller agreed and once they arrived at the McDonald's, Petitioner got out of the car and walked to another car. Id. at 194. Fuller then proceeded to take Petitioner home, but once they got to Petitioner's house, police pulled Fuller over and he, Brandi, and Petitioner were taken into custody. Id.

Brandi Johnson recalled Petitioner coming over on May 18, 2011, to ask for a ride. Id. at 249. He explained Petitioner was carrying a black satchel with one strap and that the bag "had a baby on the front of it." Id. at 250. He testified that he and Fuller gave Petitioner a ride to a residential golf course off Lakeview. Id. at 255. He said that once they got there, he saw Petitioner get out of the car and walk across the golf course while holding the black satchel. Id. at 256, 60. Fuller went to sleep, so Brandi pulled out his phone and got on Facebook. Id. at 256. He explained he then heard gunshots coming from the direction that Petitioner walked towards after getting out of the car. Id. at 258. Petitioner then came back to the car still holding the black bag and asked them to drive to the McDonald's, where Petitioner then handed the black satchel to someone in a pickup truck. Id. at 261. Brandi testified Petitioner walked to the passenger said of the pickup truck to hand off the bag, and though he could not see who was in the passenger seat of the truck, it appeared that a white female was driving the pickup truck. Id. at 261. He explained that after Petitioner

made the hand off, they drove to Petitioner's home where they were arrested. Id. at 263.

Kaja Daniels testified that on May 18, 2011, Petitioner and her ex-boyfriend, Anthony Wiggins, spoke to each other by telephone multiple times throughout the day. Id. at 329. She testified that eventually that day, around 11:30 or 11:45 p.m., Wiggins received a call from Petitioner, and after the call, she drove Wiggins in her truck to McDonald's. Id. at 332. She said she and Wiggins waited in the parking lot for about five minutes until Petitioner arrived in a Jeep. Id. at 334-35. Petitioner got out of the Jeep and approached the passenger side of her truck where Wiggins was sitting. Id. at 336. She explained that Petitioner and Wiggins had a conversation and then Petitioner passed Wiggins a black bag. Id. at 337. Daniels stated she and Wiggins then drove back to her house, Wiggins put the bag in her room, and they went to sleep. Id. at 338. She said she never looked in the bag and does not recall if Wiggins looked in the bag. Id. She stated that the next morning, Wiggins got a phone call from Petitioner and Wiggins became noticeably upset. Id. at 339. Thereafter, the police arrived at Daniels's home and arrested Daniels and Wiggins. Id. Police then found a bag with a gun in Daniels's room. Id. at 340.

Officer Steve Brandt testified that the morning after the shooting, he received briefing that the gun may be in the possesson of Anthony Wiggins. Id. at 362. Brandt made contact with Wiggins while at Daniels's home, and Wiggins

advised that the firearm was in Daniels's bedroom and was located in a bag in the closet. Id. at 364. Wiggins then pointed Brandt to the closet where the firearm was located in a brown bag, and then Wiggins pointed to the bed and said that the black bag that the firearm was originally in was under the bed. Id. at 364. Brandt recovered the firearm and the black bag. Id. at 365. Laura Draga testified she is a firearms analyst for FDLE. Id. at 345. She explained she received the following evidence in relation to this case: a .32 semiautomatic pistol, two fired bullets, and three fired .32 auto caliber cartridge cases. Id. at 355. She determined that the bullets and cartridges were fired from the .32 caliber firearm that was recovered from the closet at Daniels's home. Id. at 358, 68.

Lieutenant Christopher Sepe testified that he conducted Petitioner's initial police interrogation. Id. at 532. A DVD recording of the interview was played for the jury. Id. at 538-90. During the interview, Petitioner tells police that he did not shoot the victim but knows who did and states that he tried to convince the shooter not to commit the crime. Id. at 558. Petitioner eventually advised police that the shooter's name is "Pootie," but that he cannot remember Pootie's real name. Id. at 564. He advised that Pootie drives a pickup truck and currently has the gun in his possession and he is at his house. Id. at 561, 562, 570. When Petitioner's father and mother arrive, Sepe leaves the interrogation room. Id. at 602. Petitioner's parents then ask Petitioner what happened, and

asked Petitioner "who is Pootie?" Id. at 604. Petitioner then states that "I told him his name is Anthony Wiggins." Id. Petitioner then agreed to conduct a controlled phone call to Wiggins, and Wiggins was then arrested, and the firearm was found in his possession. Id. at 647, 650. Petitioner was released that night, but a few days later, he was arrested again, and a second police interview occurred. Id. at 664. That second interview was also played for the jury. Id. at 664-710. During that interrogation, Petitioner stated that he and Wiggins fired a gun in Petitioner's backyard early in the day on May 18, 2011. Id. at 667. Petitioner stated that the victim then called Petitioner and threatened to kill him, and Wiggins overheard the conversation and left Petitioner's house after advising Petitioner he would take care of the threat. Id. at 669. Petitioner stated that night he went to the Venezia's house in an effort to prevent the crime, and when Petitioner got to the backyard, he saw Wiggins shooting. Id. at 669-70. Petitioner stated Wiggins dropped a bag, and then Wiggins phoned Petitioner and they met at a McDonald's where Petitioner gave the bag back to Wiggins. Id. at 672.

Tyrell Mobley testified that in July 2011, he met Petitioner while they were both housed in the Flagler County Jail. Id. at 445-46. Mobley testified that Petitioner told Mobley that he wanted to kill Wiggins because he was the reason Petitioner was in jail. Id. at 452-55. Mobley also testified that Petitioner told Mobley that on the night of the shooting, Petitioner asked a friend to drive him

to a neighborhood on a golf course, where he shot his ex-girlfriend's father by sneaking around to the back of the house. Id. Petitioner also told Mobley that after the shooting, he met a friend at the McDonald's and gave him a bag and asked the friend to hold on to the bag for him. Id.

Here, Petitioner now presents an affidavit from fellow inmate Cooper, which provides that "Pooty" committed the offense for which Petitioner was convicted. However, as the trial court correctly noted, Cooper's affidavit is vague and wholly contradicts the evidence presented at trial. Cooper's statement that "Pooty" committed the crime coincides with the version Petitioner initially told police, and thus, the trial court properly determined that this statement did not amount to newly discovered evidence. This Court affords deference to that finding and concludes that the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented to the state court, nor was it based on a unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d). This claim is due to be denied.

### ii. Huffman Affidavit

Petitioner also argues a claim of newly discovered evidence in the form of a similar affidavit from Kenneth Huffman, Jr., another fellow inmate at Century Correctional Institution. Doc. 10 at 8. Petitioner raised this claim in another successive Rule 3.850 motion filed on June 6, 2017. Resp. Ex. Z at 46-47. In the affidavit Huffman states that on May 19, 2011, he was playing

basketball when he saw "Pooty," who was noticeably aggravated. Id. at 47. Huffman then asked Pooty if he wanted to talk, and Pooty confided in Huffman and explained that he had to "handle up" someone over a debt owed to him and was "doing bad," so Pooty had called Will for help. Id. Pooty then stated that Will met him at McDonald's and brought Pooty some drugs in a black bag and some money. According to Huffman, Pooty wanted to tell Will that he shot Will's friend on May 18, but could not find a way to do so. Id. Pooty told Huffman that police came to his girl's house looking for the gun, but the gun was still in his personal brown bag, so he told the officers that Will gave him the gun in the black bag. Id. Huffman stated that Pooty, nevertheless, refused to tell police or help Will and Huffman explained he did not come forward sooner because he "had issues of [his] own." Id.

Respondents argue that this claim regarding Huffman's affidavit is unexhausted and procedurally barred, because the state court never ruled on it. Resp. at 12. A review of Petitioner's state court docket shows that on June 14, 2017, the state court dismissed Petitioner's June 6, 2017, Rule 3.850 motion raising this claim, finding the motion facially insufficient for failing to comply with the requirements of Rule 3.850(c). Copeland, No. 2011-CF-000533. The state court then gave Petitioner sixty days leave to file an amended motion. Id. Petitioner proceeded to file two other successive Rule 3.850 motions raising this claim, both of which the trial court again dismissed as insufficient. Id. With the

trial court's leave, Petitioner filed a third amended successive Rule 3.850 motion on July 19, 2017, but as previously explained, Petitioner moved to voluntarily dismiss it. The state court granted that motion to dismiss on March 26, 2018. Id. As such, this claim is unexhausted and procedurally defaulted, and Petitioner fails to argue cause for or prejudice from this default. He also fails to demonstrate a fundamental miscarriage of justice exception. In any event, upon review of the evidence presented at trial, and for the reasons explained in this Court's analysis of Petitioner's newly discovered evidence claim involving Cooper's affidavit, the Court finds that this claim is meritless and due to be denied.

### D. Ground Four

Petitioner claims a double jeopardy violation in that he was allegedly charged, convicted, and sentenced for two crimes "for the single act of one firearm where the record did not establish beyond a reasonable doubt that the victim was struck by more than one bullet [and] both offenses were predicated on one single underlying act and multiple punishments were inappropriate." Doc. 10 at 10. He further argues "dual convictions for the two crimes for a single act were impermissible." Id.

Respondents argue that this claim is unexhausted and procedurally defaulted because Petitioner never raised it in state court. Resp. at 13-14. In his Amended Petition, Petitioner asserts he raised this issue on direct appeal,

Doc. 10 at 10; however, a review of his initial brief shows that Petitioner did not assert this claim during his direct appeal, Resp. Ex. I. Petitioner also claims that he raised this claim in his Florida Rule of Criminal Procedure 3.800(a) motion to correct illegal sentence, which the state court granted in part and denied in part on June 19, 2017. Doc. 10 at 10. However, Petitioner did not raise this double jeopardy claim in that Rule 3.800(a) motion, Resp. Ex. DD at 11-12, and a review of the record before the Court reveals that Petitioner did not raise this claim in any other state court postconviction motion. As such, this claim appears to be unexhausted and procedurally defaulted. Petitioner has not argued cause for or prejudice from this default, nor has he alleged facts demonstrating a fundamental miscarriage of justice.

In any event, this claim is without merit. The Double Jeopardy Clause of the Fifth Amendment protects against: (1) a second prosecution for the same offense after an acquittal; (2) a second prosecution for the same offense after a conviction; and (3) multiple punishments for the same offense. Jones v. Sec'y, Dep't of Corr., 778 F. App'x 626, 634 (11th Cir. 2019) (citing North Carolina v. Pearce, 395 U.S. 711, 717 (1969)). Regarding the protection against multiple punishments, when the same conduct violates two statutory provisions, courts conduct an analysis to determine whether the legislature "intended that each violation be a separate offense." Garrett v. United States, 471 U.S. 773, 778 (1985). In conducting the double jeopardy analysis referenced in Garrett, a court

first looks to the charged offenses and the statutes codifying those charges. If a clear indication of intent to create and punish separate offenses exists from reading the plain language of the statute, "our inquiry is at an end and the double jeopardy bar does not apply." <u>Williams v. Singletary</u>, 78 F.3d 1510, 1513 (11th Cir. 1996); <u>see also</u> <u>United States v. Stewart</u>, 65 F.3d 918, 928 (11th Cir. 1995) (stating that "when the relevant statutes on their face indicate a clear legislative intent to allow multiple punishments, we need not engage in a <u>Blockburger</u>[9] analysis, because we must give effect to that legislative intent") (citing <u>Garrett</u>, 471 U.S. at 779; <u>United States v. Albernaz</u>, 450 U.S. 333, 340 (1981)). If the legislature's intent is unclear based upon the plain language of the statutes, a court should "apply the 'same elements' test established in <u>Blockburger</u>." <u>United States v. Smith</u>, 532 F.3d 1125, 1128 (11th Cir. 2008). The rule expressed in <u>Blockburger</u> "is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." <u>Blockburger</u>, 284 U.S. at 304.

Petitioner was convicted of attempted first degree murder under sections 777.01(1), 782.04(1)(A), and 775.087(1)-(2), Florida Statutes; aggravated

---

[9] <u>Blockburger v. United States</u>, 284 U.S. 299 (1932).

battery with a firearm under section 784.045(1)(a)[10]; and shooting into a building under section 790.19, Florida Statutes. Resp. Ex. A at 274. Because Petitioner's double jeopardy claim hinges on an allegation that the victim was only struck by one bullet, it appears he is arguing that his convictions for attempted first degree murder and aggravated battery with a firearm violate double jeopardy. Doc. 10 at 10. Those statutes do not indicate a clear legislative intent to allow multiple punishments. Accordingly, the Court will review the elements of each offense under the <u>Blockburger</u> test.

In doing so, the Court finds that attempted first degree murder and aggravated battery with a firearm do not violate double jeopardy because the offenses contain different elements. <u>See</u> <u>Gutierrez v. State</u>, 860 So. 2d 1043, 1046 (Fla. 5th DCA 2003) ("[T]he elements of the two crimes were different because attempted murder requires proof of an act that could have resulted in death, which is not an element required for aggravated battery [causing great bodily harm]."); <u>see also</u> <u>Bradley v. State</u>, 901 So.2d 924 (Fla. 5th DCA 2005) (holding the defendant's convictions for both attempted first degree murder with a firearm and aggravated battery causing great bodily harm for a single act of shooting the victim did not violate double jeopardy because each offense

---

[10] Petitioner was resentenced on the aggravated battery count because the state court initially improperly enhanced the sentence for use of a firearm under 775.087, Florida Statutes, which is one of the elements of the crime. Resp. Ex. CC at 14-15.

had an element distinct from the other); <u>Schirmer v. State</u>, 837 So. 2d 587 (Fla. 5th DCA 2003) (convictions for attempted second degree murder with a weapon and aggravated battery with a deadly weapon based on the defendant stabbing the victim did not violate double jeopardy). As such, Petitioner's convictions for these offenses do not violate the Double Jeopardy Clause.[11] Ground Four is due to be denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.      The Amended Petition (Doc. 10) is **DENIED** and this case is **DISMISSED WITH PREJUDICE**.

2.      The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3.      If Petitioner appeals this Order, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending

---

[11] The Court further notes that the trial court ordered the sentences imposed for these offenses to run concurrent. Therefore, even if Petitioner was entitled to relief, the result would have no practical effect on the time he is serving.

motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[12]

**DONE AND ORDERED** at Jacksonville, Florida, this 21st day of September, 2020.


TIMOTHY J. CORRIGAN
United States District Judge


Jax-7

C:   William R. Copeland, #V42342
     Bonnie Jean Parrish, Esq.

---

[12] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).  Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.